IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 15-cv-02168-RBJ

MICHAEL SEDOY and NATALIA SHVACHKO,

      Plaintiffs,

v.

JOHN PROVINE, and
CHARLES CUNNIFFE,

      Defendants.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER OF JUDGMENT

---

This case was tried to the Court from January 23, 2017 to January 26, 2017.

## I.  FINDINGS OF FACT

### A.  The Parties.

1.  Plaintiffs Michael Sedoy and Natalia Schvachko ("the Sedoys") are a married couple who primarily reside in New York City.  PX-99 at ¶¶1–5 (Order After Trial, *City of Aspen v. Michael Sedoy, et. al*., No. 13-cv-30047 (Pitkin Cnty., Colo. Dist. Ct. May 15, 2015)). In 2011 they began to look at properties in downtown Aspen, Colorado with plans to permanently relocate their family to that area.  *Id.* at ¶5.

2.  Defendant John Provine is a real estate entrepreneur in the Aspen area.  *Id.* at ¶8. Along with former defendant James Farmer and Walt Harris, Mr. Provine founded an Aspen-based real estate redevelopment limited liability company called "JW Ventures, LLC."  *Id.* at ¶6. Mr. Provine served as co-manager of that business with Mr. Farmer.  *Id.*

3.      Defendant Charles Cunniffe is an architect by trade. *Id.* at ¶11.  In 2008 Mr. Cunniffe joined JW Ventures as a full member after working with the company designing the building plans for the property that is the subject of this dispute: 308 E. Hopkins Ave. in downtown Aspen, Colorado. *Id.*

**B.      Timeline of Events.**

4.      In 2005 JW Ventures (comprised of Mr. Provine, Mr. Farmer, and Mr. Harris) purchased the existing property located at 308 E. Hopkins Ave in Aspen, Colorado. *Id.* at ¶12. The company purchased this property, which is located on Aspen's renowned "Restaurant Row," with plans to demolish the existing structure and construct a new three-story, mixed-use building. *Id.* at ¶¶12–13.  They hired Mr. Cunniffe to design the project. *See id.* at ¶¶23–24.

5.      As will be discussed in greater detail below, Mr. Cunniffe's original building plans called for a commercial space on the ground floor ("Unit 101"), a commercial space on the lower basement level ("Unit LL1"), three affordable housing units ("AHUs") on the second floor, and two condominiums—one on the second floor ("Unit 201") and one as a third floor penthouse ("Unit 301"). *Id.* at ¶13.  These condominiums have often been referred to as the "free market units" because they were to be sold on the open market. *See id.*

6.      Mr. Cunniffe's plans also noted that the building would feature two different entrances, each providing access to separate entryways, halls, elevators, and stairwells. *Id.* at ¶¶ 27, 33.   One entrance was considered the main or "east" entrance. *Id.* at ¶ 24.  It provided access to the east entryway, hall, stairs, and elevator. *See id.*  The other entrance, known as the "west" entrance, allowed for entry to the building through the alleyway. *Id.*  It provided access to the west entryway, hall, stairs, and elevator. *See id.*  The original building plans provided that

all occupants of the building would have access to both entrances to enter and exit the building. *Id.* at ¶33.

7.      In early 2006 JW Ventures, via Mr. Cunniffe, sought the approval of these building plans by the Historic Preservation Commission ("HPC") of the City of Aspen. *Id.* ¶ 24. On July 12, 2006 the HPC adopted Resolution 18, which recommended approval of these plans. *Id* at ¶28. Next, on October 30, 2006 JW Ventures submitted its application to the City's Planning & Zoning Commission ("P&Z") for its approval. *Id.* at ¶29. P&Z adopted Resolution 18 on April 17, 2007. *Id.* at ¶34. JW Ventures then presented its development proposal to the Aspen City Council. *Id.* at ¶35.

8.      Soon after JW Ventures submitted its proposal to the City of Aspen, the City approved Ordinance 27. *Id.* at ¶¶36–37. Ordinance 27 allowed JW Ventures to build its mixed-use building with several important conditions. *Id.* These conditions included that JW Ventures record a subdivision agreement that met the requirements of the City's Land Use Code, as well as all conditions of P&Z, and that JW Ventures submit a final condominium plat (also known as a condominium map) upon substantial completion of the project. *Id.* That plat needed to be approved and signed by the Community Development Director of the City. *Id.* Furthermore, Ordinance 27 required, among other things, that JW Ventures' building permit application comply with the Americans with Disabilities Act ("ADA") and the International Building Code ("IBC"), which the City of Aspen had adopted in 2003. *Id.* at ¶¶36–37, 41.

9.      On April 28, 2009 the City issued JW Ventures a building permit based on the building plans prepared by Mr. Cunniffe. *Id.* at ¶¶42–46. As mentioned before, these building plans showed that the east entryway, stairs, and elevator were accessible by all occupants of the building. *Id.* at ¶¶16–22. The plans also noted that the east elevator would provide handicap

access to the commercial space in the lower basement level.  *Id.*  The west elevator would be used primarily by the commercial units for moving goods.  *See id.*

10.     After JW Ventures received their building permit, it prepared the condominium plat required by Ordinance 27.  *See id.* at ¶57.  Curiously, that map conflicted with JW Ventures' original building plans in many respects.  For instance, the condominium map labeled the east entryway, hall, stairs, elevator as "limited common elements" ("LCE") for Units 201 and 301. *Id.* ¶57; DX-306 (condominium plat).  This meant that these portions of the building were apparently reserved for the exclusive use of the owners of those free market units and were not for use by tenants of the AHUs.  *See* PX-99 at ¶60; C.R.S. § 38-33-103(5).  The condominium map also made it clear that tenants of the AHUs could not use the west elevator, which was designated as an LCE and a service elevator for the two commercial units in the building.  *See* DX-306.  The west entryway, hallway, and stairs, however, were designated as "general common elements" or "GCEs" (at least on the ground level), meaning that any tenant, including those living the AHUs, had unrestricted access.  *Id.*; PX-99 at ¶¶58–59; C.R.S. § 38-33-103(3).

11.     The first time JW Ventures submitted its condominium map to the City for approval, the City returned the map to the company after finding a minor error unrelated to the parts of the map described above.  PX-99 at ¶¶71–75.  This was in 2009.  *Id.*

12.     Roughly around that same time, plaintiffs began to consider buying a property in Aspen to permanently relocate their family from New York City.  They began to get serious about this plan in 2011, enlisting the help of Aspen real estate broker Tim Estin and local attorney Chris LaCroix to aid them in their home-buying process.  *Id.* ¶¶93–95.  Plaintiffs told Mr. Estin that they wished to relocate to downtown Aspen so that they could mimic the urban

lifestyle they had come to love in New York.  At the same time, however, they informed Mr.

Estin that privacy was a major concern for them with whatever property they ended up choosing.

13.     Also in 2011, roughly two years after JW Ventures first submitted its

condominium map to the City, JW Ventures resubmitted its condominium plat for 308 E.

Hopkins Ave. to the City.  PX-99 at ¶¶76–79.  Aside from making the change the City had

earlier requested, in all other respects, particularly with respect to the designated usage of the

east and west entrances, the new map JW Ventures resubmitted was the same as the 2009 map.

*See id.*

14.     Shortly after JW Ventures resubmitted its revised condominium plat in early

2011, the Community Development Director of the City of Aspen approved it.  *Id.*  As would

become clear many years later after the state court case involving this property described *infra*,

by approving the map the City was merely confirming that the map met the standards as set forth

in the City's Land Use Code.  *See id.* at ¶79.  It was not evaluating whether the designations of

certain portions of the building as LCEs, namely the east entryway and elevator, was legal.  *See*

*id.*  As the City's approval on the map explained in small print, the building's design was still

subject to Ordinance 27 and therefore numerous other City regulations regarding accessibility,

ingress, and egress.  *Id.* at ¶80; DX-306.  JW Ventures recorded the signed condominium map

with the Pitkin County Clerk and Recorder on February 28, 2011.  PX-99 at ¶83; DX-306.

15.     In the spring of 2011 JW Ventures began to experience financial difficulties.  PX-

99 at ¶90.  Specifically, the company got behind on its mortgage payments after Ute and Syzygy,

the two restaurants occupying the commercial units run by JW Ventures member Walt Harris,

could not consistently pay their full rental obligations each month.  *See id.*  By this point, JW

Ventures had also not yet sold the two free market units in the building.  *Id.*

16.     Also in spring of 2011 the Sedoys contacted JW Ventures and expressed an interest in purchasing both of the free market units at 308 E. Hopkins Ave. *Id.* at ¶93. Negotiations over the properties soon began in earnest. *Id.* Attorney Leonard Oates represented JW Ventures during these negotiations. *Id.* at ¶96.

17.     As these negotiations were ongoing, Mr. Provine apparently accompanied Ms. Schvachko and Mr. Estin on tours of the property. I use the word "apparently" because Mr. Provine vigorously denies that these tours ever occurred. Nevertheless, Ms. Schvachko testified that not only did these tours occur, but that Mr. Provine represented to her during them, as well as on numerous phone calls, that the owners of the free market units would have exclusive use of east entryway, hall, stairs, and elevator (as the condominium map indicated), except for occasional elevator use by handicapped patrons of the basement commercial unit. Mr. Estin corroborated Ms. Schvachko's account, testifying that Mr. Provine "absolutely" made such representations to Ms. Schvachko. As will be described in greater detail below, I find that it is unnecessary to resolve whether Mr. Provine in fact accompanied Ms. Schvachko on these tours or whether he did in fact represent to her during them that the owners of the free market units would have exclusive use of these portions of the building.

18.     After weeks of negotiations, the Sedoys informed JW Ventures through Mr. Estin that that they were interested in purchasing both free market units. *Id.* at ¶97. JW Ventures had advertised the two units separately—Unit 201 for around $4 million and Unit 301 for around $8 million—but the company also listed them together for a discounted price of $10.5 million. DX-201.

19.     The Sedoys liked that these units were "unfinished shells," meaning that they would be able to outfit and design the units however they wished. *See id.* However, plaintiffs

were informed by JW Ventures that they would not be able to combine the two units by adding

an internal staircase. *Id*. Plaintiffs nevertheless planned to "combine" the two units by using

what they believed was a private entryway, hall, stairs, and elevator. *See id.*

20.     Before plaintiffs would eventually close on the property, they informed JW

Ventures that they wanted to relocate the handicapped access to the basement commercial unit to

the west elevator if possible, thus making the east elevator truly "exclusive." PX-99 at ¶129; *see*

DX-204 at 3. As part of their offer, plaintiffs also requested that JW Ventures mitigate the noise

coming from the commercial units in the building, which plaintiffs had investigated with the use

of sound engineers and found to be too loud for their liking. PX-99 at ¶129; *see* PX-2 at 1–2;

DX-204 at 2–3.

21.     On June 16, 2011 the parties went under contract on the two free market units.

PX-99 at ¶99.

22.     By June 29, 2011 it appears that the Sedoys knew that patrons of the commercial

units and the tenants of the AHUs would be required to have use of the east entryway and stairs

for emergencies. *Id.* at ¶100. Plaintiffs did not object.

23.     On July 19, 2011 Mr. Estin emailed Mr. LaCroix and Ms. Schvachko

summarizing a conversation he had just had with members of JW Ventures concerning the use of

the east elevator for handicap access to the basement commercial unit. PX-2 at 13. He

explained that JW Ventures was willing to do whatever it could to help Mr. Sedoy and Ms.

Schvachko petition the City to change the use of the west elevator so that it could enable

handicap access to the basement unit. *Id.* However, Mr. Estin explained to plaintiffs that JW

Ventures had informed him on this call that the company was of the belief that there were no

guarantees that the City would agree to these changes. *Id.* In fact, they believed that it was quite

unlikely that the City would do so since it was unreasonable to expect a handicapped person to have to wheel down the long corridor to the west elevator in order to access the lower commercial unit. *Id.*

24.     The very next day on July 20, 2011 Mr. Estin investigated the handicap elevator access issue with the City at Ms. Schvachko's request. *See* DX-204.  He met with the "builder examiner of the day" Denis Murray at the City's Building Department office. *Id.* at 1.  During that impromptu meeting, Mr. Murray told Mr. Estin that it was likely impossible to change the handicap access from the east elevator to the west elevator. *Id.*  Importantly, he also explained that the City believed that the way the building was designed meant that the east elevator and the east entrance were for use by the AHUs in addition to the free market units. *Id.*  He noted that it would be "very unlikely" that the building's design could be changed. *Id.*  Nevertheless, Mr. Murray told Mr. Estin to contact the architect of the building (i.e. Mr. Cunniffe) to see if an alternative design could be worked out, but he again expressed his opinion that it was likely impossible. *Id.*

25.     Shortly after finishing this meeting with Mr. Murray, Mr. Estin apparently called Mr. Cunniffe to discuss what Mr. Murray had told him regarding the usage of the east elevator. *See id.*  Again, I use the word "apparently" because Mr. Cunniffe vigorously denies that this conversation ever occurred.  Nevertheless, Mr. Estin testified that he kept contemporaneous notes of what Mr. Cunniffe told him on this phone call and that shortly after he hung up the phone he composed an e-mail to Mr. Sedoy and Mr. LaCroix relaying to them what Mr. Cunniffe had said. *Id.*  Because of the importance of that e-mail, the Court quotes it in full and exactly as it appears below:

> With regard to the elevator, I went to the building dept this morning and spoke directly to the "building inspector of the day", Denis Murray, who is in a

wheelchair. He said that each restaurant must have its own respective handicapped access, so Ute Rest handicapped access is through their ground floor entry to the restaurant space and Syzygy handicap access is through street level entry to the front elevator.

The front elevator, he says, 'is also for use by the (3) AHU units on the 2nd floor if needed….in total there are 6 possible users of the front elevator: Zyzygy restaurant, the 3 affordable units and the 2 owners of PH 2 & 3 for handicap use". He continued, "That's the way the building was designed and it'd be very unlikely that could be changed. You could discuss with architect Charles Cunniffe to see if an alternate plan could be worked out but it's unlikely."

So, I called Cunniffe who said, "Denis Murray of the bldg dept has a personal agenda with handicap usage because its his personal MO (he's handicapped). But the way we planned for the elevator use was this:

zyzgy and #2 & 3 units owners only have keyed access to use front elevator; rear elevator provides access for 3 affordable units on 2nd floor and Zyzygy restaurant usage. If 2nd floor tenants don't like that and want to make an issue, the building owners have the right to terminate their lease based on being noisey [sic], pet issues, smoking, etc." Charles inferred that tenants are there at the "pleasure" of the building owners, that its an 'internal understanding.'

…I think this should be clarified in the buyer's objection notice by Chris Lacroix. However, bottom line, I do not believe that you will be able to change the handicap usage of the front elevator according to both Aspen City building Dept and the architect Charles Cunniffe.

*Id*.

26.     When examined about this phone call, Mr. Cunniffe testified that he never spoke with Mr. Estin on this day, and that he never informed Mr. Estin that the building had been designed such that the east elevator was only for use by the free market units and by handicap patrons of the basement commercial unit.  He maintained that the building had always been designed so that both entrances (east and west), sets of stairs, and elevators could be used by all.

27.     To prove that he never had this phone call with Mr. Estin, Mr. Cunniffe testified that he had just returned from a business trip to Florida and was in an important meeting with a client in his offices at the time of the alleged call.  He explained that his day planner could confirm his side of the story that this call never happened.  However, Mr. Cunniffe curiously

chose not to enter his day planner into evidence or otherwise subpoena a witness that would truthfully testify that he was occupied in a meeting at the time of the alleged call. I find the credibility of Mr. Cunniffe's testimony to be questionable. However, again, as will be explained in greater detail below, while I find that Mr. Estin's e-mail accurately summarizes the conversation he had with Mr. Murray at the City's Building Department office on July 20, 2011, I ultimately do not find it necessary to determine whether Mr. Estin and Mr. Cunniffe actually had this disputed phone call, or whether Mr. Estin's e-mail accurately recounts what Mr. Cunniffe is alleged to have said during it.

28.     After Mr. Estin's e-mail the Sedoys became concerned about access issues relating to the east entrance and elevator. Their attorney, Mr. LaCroix, apparently looked into the issue. PX-99 at ¶¶120–123. He reviewed the applicable laws and the "approved" condominium map. *Id.* Importantly, however, he never contacted the City before the Sedoys closed on the contract to purchase the two units to ask them to clarify their stance on this issue. He reported back to the Sedoys with his findings—namely, that the building's east entrance and elevator would function as LCE's, that is, that they would have essentially the exclusive use of that entry and elevator, as depicted in the condominium map. *Id.* Plaintiffs and Mr. LaCroix also conferred with Mr. Oates and Mr. Provine during this period of due diligence. *Id.*

29.     On July 28, 2011 the Sedoys and JW Ventures entered into an amend/extend agreement. *Id.* at ¶127. This amendment to the parties' contract concerned, among other things, noise mitigation by JW Ventures and its agreement to petition the City to change the handicapped usage of the east elevator to the west elevator so that the east elevator could truly be used "exclusively" by the Sedoys. *Id.* at ¶¶127–130.

30.     On August 4, 2011 the sale closed.  JW Ventures sold both free market units to the Sedoys by warranty deed for a sale price of $6,275,000.  *Id.* at ¶¶132–35.  Over the next few months plaintiffs carried out their plan to "combine" the units, spending close to an additional $2 million building out the apartments.  *Id.* at ¶¶143–45.  To complete this construction, plaintiffs hired John Olson, the same contractor whom JW Ventures originally hired to redevelop 308 E. Hopkins Ave.  *See id.* at ¶147.

31.     Soon after purchasing the properties, the Sedoys became irate over the amount of noise emanating from the commercial units in the building and from "Restaurant Row" below. *Id.* at ¶¶199–237.  They called the police on numerous occasions to complain about this noise. *Id.*  They also called the police multiple times to complain about the fact that AHU tenants were using the east stairwell and elevator, which the Sedoys believed were for their exclusive use aside from handicap patrons of the basement commercial unit.  *Id.* at ¶¶181–91; DX-303 (police report).  Plaintiffs would also complain of vandalism and of random people accidentally entering their second floor unit believing it was one of the AHUs.  *See id.*

32.     In the fall of 2012 after also receiving many complaints from plaintiffs JW Ventures installed a keyed access door on the east entryway.  PX-99 at ¶¶170–74.  They provided a key to plaintiffs and Mr. Harris, the owner of the basement commercial unit.  *Id.* They also removed handles on certain doors within the east stairwell so that they could only be used as emergency exits.  Despite these steps, which JW Ventures apparently took to give to plaintiffs the exclusive use of these portions of the building for which plaintiffs believed they had paid, plaintiffs continued to find other tenants, their guests, and patrons of the commercial spaces in the building using the east stairs and elevator.  PX-99 at ¶¶181–91; DX-303.

33.     The City soon caught wind that JW Ventures and plaintiffs were cordoning off access to the east entryway, hall, stairs, and elevator.  Believing that what the parties were doing was illegal and in violation of the design of the building the City had approved, the City sued to enjoin JW Ventures and the Sedoys from blocking off access to the east entryway and elevator in July of 2013.  *Id.* at ¶¶180, 192.  In addition to defending themselves in that action and filing counterclaims against the City, the Sedoys filed numerous cross-claims against JW Ventures. *See id.* at ¶486.  Judge Gail H. Nichols of the Pitkin County District Court held a trial on all parties' claims on September 30, 2014, October 1–3, 2014, and October 31, 2014.  *Id.* at 1. Meanwhile, the Sedoys continued to complain to JW Ventures and the police about these issues. *See id.* ¶¶199–237.

34.     In an extensive opinion (spanning some 90 pages) issued on May 15, 2015, Judge Nichols made two main holdings relevant here.  *See generally id.*  First, she found in favor of the City, holding that plaintiffs and JW Ventures were illegally limiting access to the east entryway, hall, stairs, and elevator because the City had never signed off on the exclusive usage of these portions of the building.  *See, e.g., id.* at ¶¶293–353.  Second, she found in favor of the Sedoys on some of their breach of contract claims asserted against JW Ventures.  *Id.* at ¶¶486–546. Accordingly, Judge Nichols enjoined the parties from limiting access to these portions of the building and ordered that JW Ventures pay plaintiffs a judgment totaling $1.28 million.  *Id.* at 87–90.

35.     Judge Nichols reached that $1.28 million figure based on the testimony of plaintiffs' damages expert Dave Ritter.  *Id.* at ¶503.  Mr. Ritter is an appraiser based in Aspen. ECF No. 130 at 2.  He testified in the present case as well, relying on the same expert report he prepared for the parties' state court case.  At trial, Mr. Ritter opined that the Sedoys would likely

have to expend $994,000 to completely renovate Unit 201 so that it could be sold as a separate unit. For reasons I still cannot understand, Mr. Ritter then concluded that the Sedoys had suffered $1.28 million in total economic damages.[1]

36.     Shortly after the lawsuit, JW Ventures went bankrupt. *See* ECF No. 126 at 6. Plaintiffs' judgment against JW Ventures was apparently rendered worthless. *See id.*

### C.     Procedural History.

37.     On September 30, 2015 plaintiffs filed this lawsuit naming JW Ventures, its individual members, and numerous other parties as defendants. Complaint, ECF No. 1. All original defendants except for JW Ventures, Mr. Farmer, Mr. Cunniffe, and Mr. Provine were either voluntarily dismissed or dismissed after filing unopposed motions. In their amended complaint against these four remaining defendants, plaintiffs asserted claims for fraud, negligent misrepresentation, and fraudulent transfer. First Amended Complaint, ECF No. 85 at ¶¶163–83. The basis of their suit is that each defendants misled them during negotiations over purchase of the properties regarding the exclusive use of the east entryway and elevator. *See, e.g.*, *id.* at ¶164.

---

[1] I have cited Judge Nichols' order to the extent its findings were consistent with the evidence presented in the present case. I do not, however, find liability in this case. Moreover, although I therefore do not reach the issue of damages, I do not understand the logic behind the Sedoys request for $1.28 million in economic damages. It seems to me that the measure of the Sedoys' damages would be the value of what they were allegedly promised minus the value of what they actually received, as well as any consequential damages and non-economic damages. *See W. Cities Broad., Inc. v. Schueller*, 849 P.2d 44, 49 (Colo. 1993) ("Damages recoverable for negligent misrepresentation include (1) the difference between the value of what the plaintiff received and its purchase price or other value given for it (out-of-pocket expenses); and (2) other pecuniary loss suffered as a consequence of the plaintiff's reliance upon the misrepresentation (consequential damages)."). In other words, to prove the first category of damages plaintiffs needed to provide evidence regarding the value that someone in the Aspen real estate market would attach to a private entryway and elevator. They did not provide such evidence. Rather, they relied on Mr. Ritters' opinion, which in turn was based on his opinion of what it would cost plaintiffs to renovate their apartment to the architect's original design so that they could sell the properties as two separate units, plus essentially unexplained additional amount. His opinion did not, in my view, reflect the correct measure of damages.

38.    On April 13, 2016 JW Ventures, Mr. Cunniffe, and Mr. Provine filed a motion to dismiss plaintiffs' amended complaint.  ECF No. 87.  Mr. Farmer filed a motion to dismiss of his own on April 18, 2016, see ECF No. 88, but eventually he settled with plaintiffs and was dismissed from the case, ECF No. 97.

39.    On December 23, 2016 the Court granted in part and denied in part the remaining defendants' motion.  ECF No. 126.  As part of its ruling, the Court dismissed JW Ventures from the action and dismissed plaintiff's claim for fraudulent transfer.  *See id.*  On January 23, 2016, exactly one month after issuing that order, the Court held a four-day bench trial of plaintiffs' claims for fraud and negligent misrepresentation against Mr. Provine and Mr. Cunniffe.  ECF Nos. 133–36 (courtroom minutes).

## II. CONCLUSIONS OF LAW

The Sedoys bought from JW Ventures what they thought was the home of their dreams—two brand new condominiums in the heart of downtown Aspen with an "exclusive" entryway and elevator.  That dream quickly became a nightmare, however, when it became clear that the private entryway and elevator the Sedoys believed they were promised would not and could not function for their exclusive benefit.

Already receiving a judgment against JW Ventures in state court for breach of contract, the Sedoys now point the finger at two individual members of that company—John Provine and Charles Cunniffe—whom they argue falsely promised to them this exclusive access.  However, plaintiffs' failure to contact the City before closing to clarify this issue after learning the City's belief that these portions of the building were accessible by all is ultimately plaintiffs' undoing. It reveals that, to the extent defendants actually made these false promises, plaintiffs did not justifiably rely on them.  *See, e.g.*, *Balkind v. Telluride Mountain Title Co.*, 8 P.3d 581, 587

(Colo. App. 2000).  Accordingly, I enter a final judgment in favor of Mr. Provine and Mr.

Cunniffe on plaintiffs' claims for fraud and negligent misrepresentation.[2]  I discuss these two

theories of liability in turn.

### A.  Fraud.

To establish fraud under Colorado law, a plaintiff must generally prove: "(1) a fraudulent

misrepresentation of material fact was made by [the defendants]; (2) the [plaintiffs] relied on the

misrepresentations; (3) the [plaintiffs] have the right to rely on, or were justified in relying on,

the misrepresentation; and (4) the reliance resulted in damages."  *See M.D.C./Wood, Inc. v.

Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994).  Thus, like with a theory of negligent

misrepresentation, to recover under a theory of fraud in Colorado a plaintiff must prove that he

or she justifiably relied on a defendant's purported misrepresentation.  *See id.*; *Balkind*, 8 P.3d at

587.

Given that reliance requirement, the Colorado Supreme Court has explained that "if a

party claiming fraud has access to information that was equally available to both parties and

would have led to the true facts, that party has no right to rely on a false representation."  *See,

e.g.*, *Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012) (holding that a party had no right to rely

on an allegedly fraudulent representation by another where it concerned readily-accessible public

---

[2] After plaintiffs' case-in-chief, defendants made a Rule 52(c) motion for a judgment in their favor, contending that the statute of limitations had expired on plaintiffs' claims.  Defendants argued that plaintiffs learned of the falsity of defendants' purported representations on September 23, 2012 via a letter from James True, Aspen's City Attorney, see DX-227, and that they therefore brought their claims (filed on September 30, 2015) one week *after* Colorado's three-year statute of limitations for fraud and misrepresentations had expired, see C.R.S. § 13-80-101(1)(c).  However, I find that plaintiffs did not know from Mr. True's letter that what defendants apparently represented earlier to them was necessarily false.  Rather, plaintiffs became apprised on September 23, 2012 that the City was maintaining its view, expressed earlier to Mr. Estin by Mr. Murray, that the east entryway and elevator of 308 E. Hopkins Ave. could not legally function as LCEs for the owners of the free market units.  Plaintiffs would not discover that defendants' purported representations were actually false until Judge Nichols held on May 15, 2015 that the City's position expressed by Mr. True was indeed correct.  Thus, their claims are not barred by the statute of limitations.

information, such as information in title documents recorded with a county clerk); *Cherrington v. Woods*, 290 P.2d 226, 228 (Colo. 1955) ("Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's representations.") (internal quotation marks and citations omitted).

Included in this category are the opinions of local government on issues related to city or town land use regulations. For example, in *Balkind v. Telluride Mountain Title Co.*, the Colorado Court of Appeals concluded that after earlier learning the Town of Telluride's belief that local land use restrictions prevented building on a certain tract of land, the buyers' failure to contact the town again before closing on that property defeated the buyers' claims against the president of the title company whom represented to the buyers that the opposite was true. *See Balkind*, 8 P.3d at 587. Citing the Colorado Supreme Court's decision in *M.D.C./Wood, Inc.*, the court explained that the evidence "that the [buyers] did not ask the Town [again] about the status of Tract J before purchasing it" revealed that they "had access to information setting out the true facts" but failed to utilize it, and therefore that they "did not have the right to rely on [the president's] representations" to the contrary. *Id.*

Such is the case here. Regardless of whether defendants in fact made the representations plaintiffs allege they did, plaintiffs knew before they purchased their two luxury condominiums that the City of Aspen—via Mr. Murray at the City's Building Department—took the position that these parts of the building were open to all, and that it was unlikely that this design could be changed. *See* DX-204 at 1; PX-99 at ¶117.

Curiously, despite being put on notice of this disagreement and valuing highly the ability to utilize a private entrance to "combine" their two condominiums into one home, neither the Sedoys nor any member of their high-powered team ever contacted the City again before closing on August 4, 2011 to clear up who was right.[3] *See, e.g.*, PX-99 at ¶¶120–26. They easily could have. In fact, plaintiffs had already gone to the City once before with a related but separate question regarding the east elevator. *See* DX-204 at 1. Ironically, it was Mr. Murray's answer to that question two weeks before closing that put plaintiffs on notice that the City believed the east entryway and elevator could not function exclusively as defendants allegedly represented to them. *See id.* And yet, after hearing that, plaintiffs never returned to the horse's mouth.

Instead, much like the buyers in *Balkind*, plaintiffs tried to figure it out themselves. *See Balkind*, 8 P.3d at 583–84. They sent their lawyer, Mr. LaCroix, to review the condominium map and applicable City regulations. PX-99 at ¶¶120–26. During that investigation, Mr. LaCroix discovered that the map—seemingly unconditionally "approved" by the City—listed these portions of the building as LCEs for Units 201 and 301. He explained all this to the Sedoys. *Id.* He also contacted JW Ventures (apparently just Mr. Provine) and the company's lawyer, Mr. Oates. *See id.* Based on their review of the condominium plat, Mr. Provine and Mr. Oates confirmed to Mr. LaCroix and plaintiffs that what the map represented was legal and approved by the City. *See id.* Relying primarily on what Mr. Provine and Mr. Oates had represented to them, see PX-99 at ¶123, plaintiffs chose to then close the deal and carry out their preconceived plans to "combine" the two units.[4]

---

[3] Judge Nichols found that plaintiffs only ever contacted the City about these issues *after* purchasing their home during their "build out" of these units. *See* PX-99 at 153.

[4] The due diligence plaintiffs conducted and the state court's finding that plaintiffs relied almost "exclusively" on Mr. Provine's and Mr. Oates's representations during this period before closing raises questions over whether plaintiffs in fact relied on Mr. Cunniffe's alleged representation about "how the

17

All parties would later find out, however, that they were wrong.  The City had not actually approved those condominium map designations.  *Id.* at ¶¶293–353.  It had not given the "green light" for this exclusive usage of the east entryway and elevator.  *Id.*  Furthermore, exclusive usage of these portions of the building turns out to be illegal.  *Id.*

Nevertheless, despite the due diligence they conducted, the Sedoys knew before they purchased their home that the City believed that the building had been designed for use by all. Although contacting the City was an easy fix to clear up this disputed issue of great importance to the Sedoys, plaintiffs subsequently failed to contact the City again before closing.  They therefore had no right to rely on defendants' alleged misrepresentations, and defendants are accordingly entitled to judgment in their favor on plaintiffs' claims of fraud.  *See, e.g.*, *Vinton*, 269 P.3d at 1247; *Balkind*, 8 P.3d at 587.

## B.  Negligent Misrepresentation.

By the same token, plaintiffs have also failed to establish that defendants are liable for negligent misrepresentation.  To establish that theory of liability, plaintiffs needed to prove by a preponderance of evidence that:

> (1) one in the course of his or her business, profession or employment; (2) [made] a misrepresentation of a material fact, without reasonable care; (3) for the guidance of others in their business transactions; (4) with knowledge that his or her representations will be relied upon by the injured party; and (5) [that] the injured party justifiably relied on the misrepresentation to his or her detriment.

*Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011); *First Nat. Bank in Lamar v. Collins*, 616 P.2d 154, 155 (Colo. 1980) (adopting Restatement (Second) Torts § 552 (1976)).  Like with fraud,

---

building was designed" roughly a week or so earlier.  *See* PX-99 at ¶¶122–23; DX-204.  For that alternative reason, I find that plaintiffs have failed to prove by a preponderance of evidence that they relied on Mr. Cunniffe's alleged statement and therefore that Mr. Cunniffe is liable for either fraud or negligent misrepresentation.  *See M.D.C./Wood, Inc.*, 866 P.2d at 1382 (fraud requires that a plaintiff actually rely on defendant's purported misrepresentation); *Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011) (negligent misrepresentation requires the same).

plaintiffs therefore needed to establish that they justifiably relied on defendants' alleged misrepresentations.  *See id.*

Simply put, the Sedoys' failure to contact the City reveals that they did not reasonably rely on any of defendants' purported representations.  While I agree that one may, in general, lay trust in the statements of a building's architect and developers about how portions of that building were designed based on seemingly "approved" plans and maps, it was unreasonable for plaintiffs to rely on those statements and documents here when they had notice that the entity in charge of approving that design (i.e. the City) disagreed with those representations.

Rather, the reasonable thing to do after discovering this conflict would have been to simply contact the City before closing to clear up the issue.  Again, curiously, despite that option being readily available to plaintiffs, they never did.  Accordingly, I find that their reliance on defendants' purported statements was unjustified.  *See Balkind*, 8 P.3d at 587.  Plaintiffs have therefore also failed to prove that either defendant is liable for negligently misrepresenting how the east entryway and elevator would function.  *See id*.

## ORDER

Finding that plaintiffs have failed to establish by a preponderance of evidence that either defendant John Provine or defendant Charles Cunniffe is liable for fraudulent or negligent misrepresentation, the Court directs that judgment enter in favor of defendants dismissing plaintiffs' claims with prejudice.  As the prevailing parties, defendants may apply for an award of costs pursuant to Fed. R. Civ. P. 54(d)(1)and D.C.COLO.LCivR (local rule) 54.1.

DATED this 27th day of February, 2017.

BY THE COURT:

R. Brooke Jackson
United States District Judge